```
 1              UNITED STATES DISTRICT COURT
 2           FOR THE SOUTHERN DISTRICT OF TEXAS
 3                    HOUSTON DIVISION
 4   _____
 5   JAASIN TAYLOR,
 6           Plaintiff,
 7       v.                                    Civil Action
 8   BALL CORPORATION,                          No.
 9           Defendant.                         4:21-cv-03173
10   _____
11              VIDEOTAPED DEPOSITION OF
12                 RUSSELL J. KENDZIOR
13   DATE:         Friday, February 10, 2023
14   TIME:         9:15 a.m.
15   LOCATION:     Remote Proceeding
16                 1845 Precinct Line Road, Suite 212
17                 Hurst, TX 76054
18   REPORTED BY:  Kelsey Peterson, Notary Public
19   JOB NO.:      5679456
```

Page 1

```
 1           A P P E A R A N C E S
 2  ON BEHALF OF PLAINTIFF JAASIN TAYLOR:
 3     MAURICIO GUEVARA, ESQUIRE (by videoconference)
 4     The Buzbee Law Firm
 5     600 Travis Street, Suite 7300
 6     Houston, TX 77002
 7     mguevara@txattorneys.com
 8     (713) 223-5393
 9
10  ON BEHALF OF DEFENDANT BALL CORPORATION:
11     KARL A. SCHULZ, ESQUIRE (by videoconference)
12     LONN PARSONS (by videoconference)
13     Cozen O'Connor PC
14     1221 McKinney Street, Suite 2900
15     Houston, TX 77010
16     kschulz@cozen.com
17     lparsons@cozen.com
18     (832) 214-3900
19
20  ALSO PRESENT:
21     Kenny Parker, Videographer (by videoconference)
22
23
24
25
                                              Page 2
```

```
 1              P R O C E E D I N G S
 2          THE VIDEOGRAPHER:  9:15 a.m.
 3          Madam Court Reporter, you may proceed.
 4          THE REPORTER:  Thank you.
 5          Good morning.  My name is Kelsey
 6  Peterson; I am the reporter assigned by Veritext to
 7  take the record of this proceeding.  We are now on the
 8  record at 9:15 a.m.
 9          This is the deposition of Russell J.
10  Kendzior taken in the matter of Jaasin Taylor vs. Ball
11  Corporation on Friday, February 10, 2023.
12          I'm a notary authorized to take
13  acknowledgments and administer oaths in Texas.
14  Parties agree that I will swear in the witness
15  remotely.
16          The reporter is located in Victoria,
17  Texas, and the witness is located in Hurst, Texas.
18          Additionally, absent an objection on
19  the record before the witness is sworn, all parties
20  and the witness understand and agree that any
21  certified transcript produced from the recordings of
22  this proceeding:
23          - is intended for all uses permitted
24          under applicable procedural and
25          evidentiary rules and laws in the same
                                              Page 4
```

```
 1              I N D E X
 2  EXAMINATION:                           PAGE
 3    By Mr. Schulz                          5
 4
 5            E X H I B I T S
 6  NO.       DESCRIPTION                  PAGE
 7  Kendzior:
 8  Exhibit 1   Defendant's First Amended Notice
 9             Of Intention to Take the Oral and
10             Videotaped Deposition of
11             Russell J. Kendzior and Subpoena
12             Duces Tecum                    7
13  Exhibit 2   Plaintiff's Rule 26(a)(2)
14             Disclosures of Expert Testimony  9
15  Exhibit 3   Traction Experts, Inc., Report,
16             Witness's Curriculum Vitae, and
17             List of Testimony             23
18  Exhibit 4   Jenkins vs. Helmerich & Payne
19             International Drilling Co.
20             Case Documents                34
21  Exhibit 5   Jaasin Taylor's Temporary
22             Employment File               83
23  Exhibit 6   Security Video of Incident   90
24             (Exhibits attached.)
25
                                              Page 3
```

```
 1  manner as a deposition recorded by
 2  stenographic means; and
 3          - shall constitute written stipulation
 4          of such.
 5          This proceeding will be recorded via
 6  video technology by Kenny Parker.
 7          At this time will everyone in
 8  attendance please identify yourself for the record.
 9          MR. GUEVARA:  Mauricio Guevara for the
10  plaintiff.
11          MR. SCHULZ:  Karl Schulz for the
12  defendant.
13          THE REPORTER:  Thank you.  And hearing
14  no objection, I will now swear in the witness.
15          Will you please raise your right hand?
16  WHEREUPON,
17          RUSSELL J. KENDZIOR,
18  called as a witness, and having been first duly sworn
19  to tell the truth, the whole truth, and nothing but
20  the truth, was examined and testified as follows:
21          THE REPORTER:  Thank you.
22          You may now proceed.
23              EXAMINATION
24  BY MR. SCHULZ:
25      Q   Sir, would you say and spell your full name?
                                              Page 5
```

2 (Pages 2 - 5)

**Page 14**

1  private investigators, I'm -- I'm not qualified to
2  render opinions on that.
3     Q   Sure.  I don't just mean private
4  investigators, sir, but all kinds of investigators,
5  like police investigators, fraud investigators,
6  internal investigators.  Would you agree with me that
7  those kinds of investigators probably do interview
8  alleged victims and witnesses?  Don't they?
9     A   Again, I'm not here to render opinions about
10 what investigators do.  I'm not an investigator.  I
11 would only be able to speculate as to what that
12 profession does and how they conduct themselves and
13 what the standards are for investigators.  I'm not
14 retained as an investigator in this matter.
15    Q   Okay.  So to be clear, sir, for the jury,
16 you didn't investigate this loss at all; is that
17 right?
18    A   That's correct.  I -- I did not perform any
19 type of investigation.  Just reading the documents and
20 the facts and evidence, testimony that was provided to
21 me, along with the surveillance video.
22    Q   In connection with your review, were all of
23 the documents that you reviewed provided by
24 Mr. Taylor's counsel?
25    A   Yes.

**Page 15**

1     Q   Did you do any independent investigation
2  regarding the incident or Mr. Taylor?
3     A   No.  As I said, I have not performed any
4  investigation.  I'm not an investigator.  I was not
5  retained in that capacity.
6     Q   Okay.  Did you do any independent analysis
7  of facts or data regarding the incident or Mr. Taylor?
8     A   Certainly.  All the data that -- or
9  documents you see in my report and that you have on
10 the screen is what I reviewed in preparing my report
11 and subsequent opinions.
12    Q   Sure.  But I mean did you do consulting of
13 sources on the Internet or library sources or
14 professional sources to try and learn more about the
15 incident or Mr. Taylor?
16    A   No.  When you say -- when you say "library
17 sources," maybe I should clarify.  What do you mean
18 by -- I mean, I have a library of my own, library of
19 standards.  In fact, I cited them in my report.  But I
20 didn't seek out any library.
21    Q   Okay.  That's fine.  Did you run any tests,
22 sir, on any of the fluids involved in the alleged
23 incident?
24    A   No, I did not.
25    Q   Did you run any tests on any oil or

**Page 16**

1  hydraulic fluid?
2     A   You mean at the location in question?
3     Q   Correct.
4     A   No, I did not.
5     Q   Any sort of lubricants used at the location?
6     A   No.  I've not been to the location, and I
7  did not do any testing.
8     Q   How about soap at the location?
9     A   I just think I answered that.  I've never
10 been to the location.  I never tested any -- any
11 floors under any conditions at -- at the location.
12    Q   Okay.  So no water testing either?
13    A   That's correct.
14    Q   Is there a reason you didn't go to the
15 location?
16    A   I was not asked to.
17    Q   Okay.  Do you normally go to a location to
18 analyze an incident and form your opinions?
19    A   Not normally, no.
20    Q   So just to be clear, sir, you didn't go to
21 the Ball location, and you didn't test any surfaces
22 there; is that correct?
23    A   That's correct.
24    Q   And you didn't test the floor where the
25 alleged incident occurred; did you?

**Page 17**

1     A   No.
2     Q   Did you run any tests on Mr. Taylor's shoes
3  that he was wearing?
4     A   I don't know what types of shoes Mr. Taylor
5  was wearing and did not perform any tests.
6     Q   Any tests of any kind on anything?
7     A   No.  I've not performed any tests in this
8  matter.
9     Q   Did you do any testing of coefficient of
10 friction?
11    A   No.
12        MR. SCHULZ:  Lonn, can you scoot down,
13 please, to subsection (iv)?
14 BY MR. SCHULZ:
15    Q   This is a reference, sir, to your CV, which
16 we can pull up separately.  But I'm just going to ask
17 you questions, here, of a general nature.  Do your
18 qualifications include any training, education, or
19 experience that is particular to Ball?
20    A   I'm sorry.  Can you rephrase that?
21    Q   Sure.  Have you ever worked at Ball, been
22 trained at Ball, had any involvement with Ball itself?
23    A   No.
24    Q   Have you done any research regarding Ball or
25 its operations?

**Page 18**

1  A  Research in what way?
2  Q  For example, research about Ball on the
3  company website, or maybe a publicly traded finance
4  page from the Internet, or marketing materials that
5  Ball may have, anything like that concerning Ball.
6  A  No.
7  Q  Do you have any background of any kind with
8  manufacturing or recycling of aluminum cans?
9  A  No.
10  Q  Do you have any background of any kind with
11  a baler, or briquetter machine, as it's been described
12  in this case?
13  A  No.
14  Q  Do you have any background of any kind
15  concerning janitorial services?
16  A  Janitorial what?  You cut out on me.
17  Q  I'm sorry.  Janitorial services.
18  A  Yeah, I'm very familiar with the janitorial
19  industry.
20  Q  Okay.  Can you tell me more about that,
21  please?  How did you come to be familiar with it?
22  A  I worked in that industry as a supplier of
23  janitorial products.  The janitorial industry's
24  primary trade association is one that I've worked
25  personally with for several -- probably 20 years, and

**Page 19**

1  that's the International Sanitary Supply Association,
2  or ISSA.  In fact, I've actually attended that
3  organization as a speaker several times.  I also work
4  closely with the International Executive Housekeepers
5  Association.  I've spoken in front of that group as
6  well.
7       Both of those organizations serve on the
8  board of directors of the National Floor Safety
9  Institute, which I chair.  I worked closely for many
10  years with other manufacturers of cleaning products,
11  cleaning equipment, have worked in the area of
12  standards development for the standards that were
13  created for maintenance.  That's published through the
14  International Sanitary Supply Association and other
15  standards-developing organizations.
16       And I test.  I've tested, over the -- the
17  years, products that are manufactured by the
18  janitorial supply industry, manufacturers of cleaning
19  products -- automated equipment, mops, buckets, et
20  cetera -- on behalf of the National Floor Safety
21  Institute.
22  Q  Have you ever done janitorial work yourself?
23  A  I have.
24  Q  Can you tell me about that, please?
25  A  Yeah.  I worked as a janitor.  I don't know

**Page 20**

1  if you want to -- if that was the actual -- my title.
2  But my first company was called Traction Plus.  And as
3  I mentioned, I -- we manufactured cleaning products,
4  chemicals.  And as part of my responsibility, I would
5  apply the cleaning products, safety treatments, to
6  floors for prospective customers.  Did that for
7  probably seven or eight years.
8       And so although I was not employed as a
9  janitor, I did janitorial work, predominantly cleaning
10  floors, mopping floors with the products that I had
11  developed and marketed to -- to a wide -- wide range
12  of industries.
13  Q  So I just want to be clear.  When you were
14  doing that work, it was more in terms of a testing- or
15  demonstration-type setting?  It wasn't mopping and
16  sweeping after hours at an office building, that kind
17  of thing?
18  A  No, that's exactly what it was.  It was not
19  office buildings, but predominantly restaurants,
20  commercial locations.  And that's exactly what -- what
21  I would do, is go in after hours and mop and sweep
22  floors, oftentimes training my -- my customers' staff
23  on -- on how to provide -- or how to use the products
24  I was selling them.  So no, I was actually mopping and
25  cleaning floors.

**Page 21**

1  Q  How much time did it take to train those
2  customers' cleaning staff?  Would that be completed in
3  an evening?
4  A  Yes.
5  Q  Is it fair, then, to say that janitorial
6  work does not require extensive training?
7  A  It depends.  When you use the term
8  "janitorial work," that's a very broad range of -- of
9  duties.  My specific area of janitorial work is -- is
10  isolated to cleaning and mopping of floors,
11  maintaining commercial floors.
12  Q  Okay.  And does cleaning and mopping floors
13  require extensive training?
14  A  I don't know how you would define extensive,
15  but there is -- yes, there is training that is
16  required.
17  Q  Can it be completed in an evening, like we
18  talked about?
19  A  Yes, it can.  It should be.
20  Q  Do you have any indication that Mr. Taylor
21  did not receive sufficient training regarding mopping,
22  sweeping, and care of floors?
23  A  By whom?  Sufficient training?
24  Q  By Ball.
25  A  I don't know if Ball provided any training

**Page 22**

1  to Mr. Taylor.
2     Q   So you don't have any opinion on the degree
3  of training Mr. Taylor received or its adequacy?
4     A   At this time, I'm unaware of what training
5  Mr. Taylor received from Ball as a function of his job
6  at the time he was working at their facility.
7     Q   Okay.  But I want to be clear.  You're not
8  going to come back and say later, his training was
9  inadequate?  You just don't know or have enough
10 information at this time?
11    A   Well -- and again, I'm refining my opinions
12 to his training as -- you asked regarding mopping the
13 floor, cleaning the floor.
14    Q   Right.  So my specific question, then, is,
15 you don't have an opinion, at the time, regarding the
16 adequacy of Ball's training or not training for
17 Mr. Taylor's mopping and sweeping work on floor
18 surfaces; is that correct?
19    A   Yes.  And that's because I -- I have no
20 information regarding what training he received.
21 If -- if I receive documentation or there's testimony
22 that, after my deposition today, reveals his training,
23 then, obviously, I reserve the right to amend my
24 opinions in the future.
25        But as of today, I have no knowledge of

**Page 23**

1  Mr. Taylor's trainings by Ball as it relates
2  specifically to mopping the floor.
3         MR. SCHULZ:  All right, Lonn, let's
4  take that down, please, but keep it handy.  If you
5  would, please bring up and mark as Exhibit 3 what's in
6  our file as Exhibit A.
7         (Kendzior Exhibit 3 was marked for
8         identification.)
9  BY MR. SCHULZ:
10    Q   All right.  Sir, we're looking at Exhibit 3,
11 which I think is a collection of your report and your
12 CV, which is lengthy, and a list of testimony.
13        MR. SCHULZ:  Lonn, would you please
14 just scroll up and down a bit so that the witness can
15 orient himself, please?
16 BY MR. SCHULZ:
17    Q   Is this all looking familiar, sir?
18    A   Yes.
19    Q   Great.
20        MR. SCHULZ:  Lonn, would you please get
21 to page 33 of the PDF?  Sorry.  Page 16.
22        MR. PARSONS:  What was that, Karl?
23        MR. SCHULZ:  If you would, please get
24 to page 16 of the PDF.
25        MR. PARSONS:  Sixteen.  You just broke

**Page 24**

1  up for a second.  I couldn't hear "16."
2         MR. SCHULZ:  Sorry.  Thank you.
3  BY MR. SCHULZ:
4     Q   All right.  Sir, this is a portion of your
5  CV, and, in particular, we're looking at "Professional
6  Associations."  Do you see that, sir?
7     A   Yes.
8     Q   One of your professional associations is
9  "The Association of Certified Fraud Examiners,"
10 AFCE [sic].  Do you see that, sir?
11    A   Yes.
12    Q   Can you please tell me about that
13 credential?
14    A   I worked with the Associate of Certified
15 Fraud Examiners on and off for probably eight to ten
16 years.  I think we were both interviewed for a media
17 television program a long time ago and developed a
18 working relationship with them.
19        Obviously, they cover a wide range of
20 potential fraud related to injury claims or other
21 types of matters.  And so it was helpful to understand
22 their perspective, specifically as it relates to fraud
23 that may exist, and the techniques used to investigate
24 fraud for slips, trips, and falls.
25    Q   So are you a certified fraud examiner

**Page 25**

1  yourself?
2     A   No, I'm not.
3     Q   But you're a member of this organization?
4     A   Yes.  It -- I don't know if I'm still a
5  member of the organization, but it's a -- it's an
6  association that I've been aligned with.
7     Q   Did you learn about fraud examination and
8  how to do at least some of it yourself?
9     A   No.  I'm not a fraud examiner.
10    Q   Is fraud an issue with regard to slip, trip,
11 and fall claims?
12    A   Certainly.  Fraud is associated with many
13 different types of claims.  In the area of slip, trip,
14 and fall, it's -- a very, very small percentage of
15 claims are considered to be fraud.  Less than
16 10 percent.
17    Q   Less than 10 percent?
18    A   Yes.
19    Q   But every year there are at least some slip,
20 trip, and fall claims that are false or exaggerated;
21 is that fair?
22    A   I would presume that's true, yes.
23    Q   How do claimants fake or exaggerate slip,
24 trip, and fall claims?
25    A   How do they claim or exaggerate?

```
 1   Q   Right.  What methods do they use?
 2   A   Well, I think I wrote about this in my first
 3  or second book.  There's two different -- generally
 4  speaking, two different types of fraud.  One is hard
 5  fraud, which is just a individual either stages an
 6  event, kind of pours water on the floor -- you see
 7  this on television programs -- and then lays down on
 8  the floor, claiming they fell.  That's -- that's
 9  considered -- or what's known as hard fraud.
10       Then there's a soft fraud.  That's where
11  somebody actually does get injured, but perhaps it may
12  not be as severe as -- as they claim.  And it's
13  difficult.  You know, it's difficult to investigate
14  either types of fraud.
15       And so again, that's why organizations like
16  the American Society of Fraud Examiners and the
17  National Insurance Crime Bureau, another organization
18  I've worked with -- that's their specialty.
19  They -- they investigate those types of matters.
20   Q   What are some red flags in an incident that
21  may be an indication of fraud?
22   A   There's a wide range of, I guess you can
23  call, red flags or yellow flags.  If the claimant
24  story doesn't make sense.  You know, they say they
25  were injured in a particular location due to a
                                                Page 26
```

```
 1  particular event or hazard, and then you find out
 2  later that actually didn't happen, that the story
 3  doesn't make sense.  That's the biggest red flag, is,
 4  you know, the -- the claimant's story simply is
 5  unclear.  Maybe that's the best way to put it.
 6  That -- that's a red flag.
 7       Oftentimes, again, just based on my
 8  understanding of the -- the area of fraud relating to
 9  slips, trips, and falls, the -- generally, the people
10  that commit slip-and-fall or trip-and-fall fraud are
11  very, very small.  But they're very, very active.  And
12  so you'll find that another flag is that the person
13  has a long history of filing similar claims.  That --
14  that's a -- that draws attention.
15       Third, they tend to oftentimes have a
16  better-than-typical understanding of the process by
17  which filing claims works.  And so there's kind of a
18  long list.  I think it's in my second book, maybe my
19  third book, that I -- that I talked about
20  slip-and-fall fraud and -- and some of the red flags
21  or flags that are associated with detecting fraud.
22       And -- and the reason why that's important
23  is because it really hurts the legitimate victim of a
24  slip and fall.  People tend to think, oh, it's -- you
25  know, all these victims are fake.  Very few are.
                                                Page 27
```

```
 1  Very, very few are.  But it does hurt the reputation
 2  of legitimate victims by those who commit fraud.  And
 3  that's true of all forms of fraud.
 4   Q   Is an unwitnessed accident a potential red
 5  flag for fraud?
 6   A   It could be.  Depending on the -- the
 7  specifics, it could be.
 8   Q   Is a short-time employee a potential red
 9  flag for fraud?
10   A   It depends.  Again, there's a lot of
11  variables that go into -- people who may be unfamiliar
12  with a particular workplace are more -- are at a
13  greater risk of a hazard because their lack of
14  familiarity.
15       If people are -- are, for example,
16  working -- well, like, Mr. Taylor.  He's working for
17  a -- a company, ManPower, that puts him on different
18  projects daily.  That's his job.  His job is to go
19  to -- from one project to the next project.  And so
20  he's kind of a day-worker, a short-term employee.
21       They're the most vulnerable because they
22  usually get the least amount of training, especially
23  when they're exposed to a hazardous condition.  So
24  it -- it depends.
25   Q   Is a claimant with a criminal history a
                                                Page 28
```

```
 1  potential red flag for fraud?
 2   A   It could be.  It depends on the crime, of
 3  course, and length of time.  You know, if somebody got
 4  a traffic ticket 20 years ago, that's -- doesn't
 5  necessarily raise a red flag.  It's crime in the --
 6  generally in the same area.
 7       Remember, fraud -- filing a fraudulent claim
 8  is -- is a crime.  And so if somebody's been doing
 9  that over time, meaning filing fraudulent claims, then
10  that would be the -- that would be the -- the -- more
11  likely the -- the red flag.
12   Q   Is someone with a demonstrated history of
13  dishonesty a red flag for a potential fraud?
14   A   That's a tough question 'cause that would
15  exclude pretty much all of our elected officials.
16  It's hard to say.  You know, we live in a very
17  different world today where terms like "fake news" are
18  rampant, and truth is sometimes hard to -- to get to
19  the bottom of.  But yes, obviously, truthfulness
20  is -- is important, of course.
21   Q   Well, sir, in this case, I wasn't talking
22  about politicians.  I was talking about slip, trip,
23  and fall claimants.  Is a slip, trip, and fall
24  claimant with a demonstrated history of dishonesty a
25  red flag for fraud?
                                                Page 29
```

8 (Pages 26 - 29)

### Page 30

1  A   I don't know.  I -- that -- that would be
2  beyond my ability to deduce.  When you say "honesty,"
3  that's a -- that's -- dishonesty is in the eye of the
4  beholder.  But certainly is -- if somebody has been
5  dishonest in the claims process, all right, as they're
6  filing claims and reporting injuries, and their
7  statements are based on information that is found to
8  be untrue, meaning they've been dishonest, that's --
9  that's generally more relevant, yes.
10     Q   Okay.  Sorry.  Did you say that "dishonesty
11  is in the eye of the beholder"?
12     A   I said truth and -- yeah, in many ways, you
13  know, we live in a world where truth is in the eye of
14  the beholder.  That's -- that's the world we live in.
15  So I'm not making any excuses, but I'm saying what --
16  what qualifies as dishonesty or lying, or other
17  adjectives, is oftentimes debatable.
18      For example, if somebody had an opinion as
19  to an event that they believe is true, and somebody
20  else comes along and says, "I totally disagree.
21  You're wrong," well, were they dishonest?  It's really
22  a matter of the claims process.
23      That's what my point is, and I guess that
24  was your original question, is, as it relates to red
25  flags for slip-and-fall fraud, is dishonesty an area?

### Page 31

1  Yes, as it relates to the claim that they're --
2  they're being dishonest about.  Not if they lied and
3  said, you know, I didn't have pizza last night, when,
4  in fact, they did.
5     Q   Is it a red flag for fraud if someone
6  lawyers up quickly after an incident?
7     A   It depends.  In some cases, it could be.  In
8  other cases, not necessarily.
9     Q   Did you rule out fraud in this case with
10  Mr. Taylor?
11     A   I've been -- I've not been provided or
12  presented with any information that would suggest
13  Mr. Taylor is committing a act of fraud in this
14  particular case.  That he, in fact, did slip and fall,
15  and he did injure himself, that's -- I'm taking that
16  as truthfulness.
17     Q   Well, that's a little different than ruling
18  it out, sir.  Did you rule out fraud in this case?
19     A   I have no evidence to suggest that he's
20  committing any type of fraud.
21     Q   Okay.  "Yes" or "no", please.  Did you rule
22  out fraud?
23     A   Yes.  It's my opinion that Mr. Taylor has
24  not committed or is not in the process of committing
25  an act of -- of fraud.

### Page 32

1     Q   What's the basis for that opinion?
2     A   Well, I just said it a moment ago.  There's
3  been no evidence provided to me, at all, that would
4  suggest he is.  And so to accuse somebody of fraud,
5  you have to have a basis.  You have to have some
6  evidence, and there's no evidence in this case, to my
7  knowledge.
8     Q   Are there potential red flags in this case
9  for fraud?
10     A   Not really.  I -- I don't see any strong
11  indication of fraud in this case.  And again, please
12  understand I'm not a professional fraud examiner.
13  I'm -- I have some limited understanding of those
14  conditions, but I am not a -- I'm not a fraud
15  examiner.  I'm not a professional fraud investigator,
16  so I'm probably not qualified to render opinions
17  specifically about fraud in this matter.
18     Q   So if you're not qualified to give opinions
19  about fraud, you're not able to rule it out; are you?
20     A   Like I said, unless there is evidence
21  provided or presented to me that would suggest that
22  there was some act of fraud, I'm not going to assume
23  that there was.
24     Q   Sir, I gather you give testimony for both
25  plaintiffs and defendants?

### Page 33

1     A   Yes.
2     Q   Is there a percentage that you can assign to
3  each side?
4     A   Oh, gosh, I don't know.  I've never really
5  sat down and added them all up.  I think I've been
6  retained in about 1300 lawsuits representing both
7  plaintiffs and defendants.  The vast majority would be
8  representing plaintiffs.
9      I would estimate it to be around 75 percent
10  of my retentions are on the -- on the part of a
11  plaintiff, and the remaining 25 percent would be
12  retentions from a defendant.
13     Q   Have you ever been retained by Mr. Buzbee's
14  firm or attorneys in his firm before?
15     A   I have, I think, or have had a previous case
16  or -- or a second case with the same firm.  I don't
17  know the time proximity, but I think there was a -- a
18  previous case.
19     Q   Just one other, though?
20     A   I think so.  I haven't gone through and --
21  as I mentioned, after 1300 cases, they kind of -- kind
22  of turn into a -- they kind of get blurry.  But I do
23  have a list of past cases that I assume you have,
24  all -- all my retentions.  And if you want to go
25  through the list to see if there's any other

9 (Pages 30 - 33)

```
 1  retentions, there -- there may be.  I'm just not aware
 2  of them.
 3      Q   Have you ever had your opinions or testimony
 4  limited or stricken by a Court?
 5      A   I've had -- yeah, I've had a couple of cases
 6  where federal judges, federal cases, felt that my
 7  testimony would not be needed, not on the basis of
 8  qualifications, but they felt that the case would be
 9  easily presented without expert testimony,
10  specifically my testimony.
11      Q   Have you ever been qualified as an expert in
12  the Southern District of Texas where this case is
13  pending?
14      A   I don't keep track of all the courts that
15  I've been -- been in and been accepted by, but it's --
16  it's probable that I have, yes.
17      Q   One of those cases where the Court decided
18  that your opinions would not be helpful to the jury
19  was in the Southern District of Texas; wasn't it?
20      A   I don't know.
21          MR. SCHULZ:  Okay.  Lonn, can you
22  please bring up the Jenkins case, and mark it as the
23  next Exhibit 4.
24          (Kendzior Exhibit 4 was marked for
25           identification.)
                                                    Page 34
```

```
 1          All right.  Lonn, can you please scoot
 2  down to the next page?
 3  BY MR. SCHULZ:
 4      Q   All right.  Sir, do you remember a case
 5  called Jenkins vs. Helmerich & Payne International
 6  Drilling Company?
 7      A   No, not offhand.
 8      Q   Looks like that was Arnold & Itkin out of
 9  Houston here.  Do you recall that one at all?
10      A   No.
11          MR. SCHULZ:  Okay.  Lonn, we're going
12  to be toggling back and forth between this opinion and
13  the previous report.  So let's go back to the
14  witness's report and look at page 4 of the PDF.  This
15  is it.  Thank you.
16  BY MR. SCHULZ:
17      Q   All right.  Sir, your first opinion in this
18  case is listed here, number 1.  "The condition of the
19  walkway at the time of Mr. Taylor's fall constituted a
20  dangerous condition and posed an unreasonable risk of
21  harm."  Is that your opinion, sir?
22      A   Yes.
23      Q   And what was the basis for that opinion?
24      A   Well, the presence of hydraulic fluid on a
25  workplace walkway or working surface constitutes a
                                                    Page 35
```

```
 1  slippery condition.  And the standard of care requires
 2  that walkways in industrial locations like this, or
 3  workplace, have to be maintained dry and in a sanitary
 4  condition, and the rule calls for that to be
 5  slip-resistant.
 6          So if you have a oil spill -- and oil spills
 7  happen -- in this case, hydraulic fluid, you need to
 8  barricade the area and not permit workers into the
 9  area until the hazardous condition is removed, cleaned
10  properly.  And then the barricades would be taken
11  down, and workers would be allowed to enter that
12  workplace.
13      Q   Okay.  And we've already established, sir,
14  that you didn't test the surface, any fluids, or
15  coefficient of friction in this case; correct?
16      A   That's correct.
17      Q   And you don't know the makeup of the oil or
18  hydraulic fluid from the machines?
19      A   No, I've not actually examined the actual
20  fluid.  And I -- my understanding, it was hydraulic
21  fluid, which is oil -- an oil-based product.
22      Q   Sure.  But we don't know what particular
23  brand or grade; is that correct?
24      A   Yeah.  I -- I don't know.  That's correct.
25      Q   Okay.  And you didn't examine the soap
                                                    Page 36
```

```
 1  either?
 2      A   That's correct.
 3          MR. SCHULZ:  Okay.  Lonn, let's go back
 4  to the Jenkins opinion on page 6 of the PDF.  That's
 5  it.  Yeah.  Oh, down a little bit, please.
 6  BY MR. SCHULZ:
 7      Q   So, sir, it looks like, in the Jenkins case,
 8  you gave a very similar opinion; is that fair?
 9      A   I don't remember.  I may have.
10          MR. SCHULZ:  Okay.  Let's scoot down a
11  little bit more, please.
12  BY MR. SCHULZ:
13      Q   The Court states here that "Kendzior ran no
14  tests on the stairs or the contaminating material.  He
15  does not know what the coefficient of friction was for
16  the contaminated stairs.  He does not know the true
17  makeup of the contaminating materials.  His opinion,
18  then, is ... not the product of any testable
19  methodology or evidence-based analysis.  Consequently,
20  Kendzior's opinion on the danger posed by the stairs
21  does not appear reliable."  Did I read that correctly,
22  sir?
23      A   Yes.
24      Q   Was your analysis, in this case, any
25  different from what the Court found was insufficient
                                                    Page 37
```

in Jenkins that I just read to you?
A I don't know. I'm -- I'm not familiar -- I don't recall this case.
Q Okay. But suffice it to say, sir, you don't know the true makeup of the oil, the soap, or the water; is that correct?
A Well, it may be impossible to know that, so. For example, if I was to go out today and want to take measurements of the coefficient of friction of the floor, the first thing -- the first thing you have to recognize is it's a different floor, different surface -- potentially different surface contaminant. I don't know the volume of contaminant that was on the floor. There's a lot of variables that would have potentially changed the condition.
And so by taking test results of a -- of oil on the floor, first of all, there's no standard. And in this particular case on the screen, there's no standard, no scientific methodology that's published to take measurements of mud or whatever this product was on the stairs.
Nor is there a standard for measuring the slip-resistance of hydraulic fluid on a floor. The standards that are published through the National Floor Safety Institute don't call for oil or hydraulic

Page 38

fluid or mud on stairs, but rather water with a small amount of SLS, which is a soap-like substance.
And so perhaps, in this case that's on the screen, that was not made clear by the retaining attorney. So doing tests on a surface that there is no scientific basis for -- for conducting that test would only mislead the Court.
And the same is true in this case. This particular event took place in 2021, two years ago. I was retained in this case a year after that, and so the condition of the worksite were different from the time of the event to the time I was retained.
And so it's -- I guess it would be fair to say putting oil on a floor would -- would constitute an unreasonably dangerous condition given that oil is a lubricant. That's what it's used for. And having a lubricant on a floor, regardless of the specific coefficient of friction, would present a slip hazard.
Q So by the time you came along, the facts that you would have needed regarding the material and the surface were unknowable?
A No, that's not what I'm saying. We're talking about testing. The document you have on the screen suggests that, because I didn't do any testing -- and I guess that's what you're asking me in

Page 39

this case 'cause I wasn't doing -- I didn't do any testing of the -- the surface in question -- somehow would disqualify me from rendering opinions.
And my -- my point is, 99.999 percent of the time somebody slips and falls, the condition will change before experts, whether it's myself or somebody else, are retained. So you can, you know, throw a case out, if you will. And by the way, that's -- that's typical. Federal judges don't like slip-and-fall cases, so they find every reason, in my opinion, to get rid of them. They just don't like them. And so this is, I guess, as good of a reason as any.
But my point is, you can -- you can say that about every slip-and-fall case, all right. Because you didn't go out and test it immediately at the time the person fell, you -- your -- your knowledge, your understanding, the facts really don't matter. All that matters is testing. And it's actually the opposite.
The testing is -- is, in many times, irrelevant 'cause you can't reproduce the actual exact conditions. In some -- in some cases, testing is more relevant in a -- in a lawsuit. But in this case, it would be very hard to replicate, so why confuse the

Page 40

jury? Especially since the methodology is not specific to measuring the slip-resistance of hydraulic fluid on a concrete floor.
Q But it sounded, by your earlier testimony, sir, that there is no methodology that could be applied. I think you mentioned that there were no standards for testing or measuring by various national organizations; is that correct?
A Yes. And that's, you know -- that's -- oftentimes a lot of these matters, just due to insufficient good lawyering, get discharged because the relevant information, like what you just asked, wasn't presented. So you can't test a -- a walkway with hydraulic fluid to any national standard with any test method. Nothing's recognized.
You can come up with data and say, wow, oil is really slippery on the floor. Well, okay. I think that would be fair to say. Everybody would under -- would understand that. What the exact coefficient of friction is, as I was mentioning earlier, is a bit irrelevant.
My onions, as you saw on the screen before, speak to the fact that having hydraulic fluid on the floor, known to be on the floor, discharging, at the time, on the floor, represents an unreasonably

Page 41

 1  dangerous condition to workers who have to work in
 2  that area.  That's -- that's my opinion.  And
 3  presumably, that was my opinion in the case that you
 4  have on the screen of Jenkins vs. Helmerich & Payne
 5  Drilling.
 6          MR. SCHULZ:  Lonn, let's go back to the
 7  witness's report, same page.
 8          MR. PARSONS:  I'm sorry.  Which page
 9  was it, Karl?
10          MR. SCHULZ:  Four.  Sorry.  Four of the
11  PDF.
12  BY MR. SCHULZ:
13      Q   So, sir, was your second opinion "The
14  defendant knew or reasonably should have known of the
15  dangerous condition of the walkway prior to
16  Mr. Taylor's slip and fall and should have placed
17  absorbent pads on the walkway and posted warning signs
18  as to alert workers to the impending slip hazard"?
19      A   That's correct.
20      Q   What's the basis for that opinion?
21      A   Well, that's the standard of care to --
22  once -- once a hazardous condition is identified -- in
23  this case, a hazardous condition was being generated
24  by leaking hydraulic fluid on the floor.  The
25  defendant's employees were aware of that, had

Page 42

 1  extensive knowledge of that.  Repairs were allegedly
 2  to be taking place.  They -- they were not, and
 3  Mr. Taylor was exposed to that hazardous condition,
 4  both at the time he started the project with Ball on
 5  Saturday, July 24, 2021, as well as the -- the next
 6  day, Sunday, July 25th, which is when he slipped and
 7  fell.
 8          So once a -- I -- once a hazardous condition
 9  is identified, items -- well, all four -- five of
10  those opinions would constitute the standard of care.
11      Q   Okay.  It's your opinion that Mr. Taylor
12  worked on that Saturday as well?
13      A   He was there, yeah, the day before, on the
14  24th.
15      Q   Wasn't the 24th a Friday?
16      A   My understanding it was a Saturday.  I may
17  be wrong.
18          MR. SCHULZ:  All right.  Lonn, let's go
19  back to Jenkins, please.  And we're on page 7 of that
20  PDF.
21  BY MR. SCHULZ:
22      Q   So number 2 in the Jenkins case looks to be
23  substantially the same as your opinion in the
24  Taylor --
25      A   I don't know.  I've not seen this document.

Page 43

 1      Q   Well, you said, in the Taylor case, "The
 2  Defendant knew or reasonably should have known of the
 3  dangerous condition of the walkway prior to
 4  Mr. Taylor's slip and fall and should have placed
 5  absorbent pads on the walkway and posted warning signs
 6  as to alert workers to the impending slip hazard."
 7          So it looks like it's substantially similar
 8  except to the last part about pads and warning signs;
 9  is that fair?
10      A   Yes.
11      Q   Okay.  The Court in Jenkins opined that the
12  jury didn't need your help in deciding the timeline
13  issues and wasn't helpful and didn't allow you to make
14  that opinion.  But you gave that very same opinion, or
15  at least the first part of the opinion, in this case
16  as well; didn't you?
17      A   I don't know how to answer your question.  I
18  was -- there was no -- I guess, maybe let me back all
19  the way up.  Prior to you showing this -- this to me
20  today, sir, I have never seen this.  I had no idea
21  that -- any of this.  I never testified at trial.  I
22  was not informed any of the statements you're going
23  over today, so I don't know.  This is kind of news to
24  me.
25      Q   Okay.  I'll represent to you that this

Page 44

 1  opinion was published on December 30, 2021.  Does that
 2  ring any bells?
 3      A   No.
 4      Q   Your report in this case was written after
 5  December 30, 2021; wasn't it?
 6      A   Yes.
 7      Q   You have a further opinion about putting
 8  down absorbent pads and posting warning signs.
 9          MR. SCHULZ:  And, Lonn, let's go back
10  to his report for that one.  Page 4.  Thank you.
11  BY MR. SCHULZ:
12      Q   All right.  Sir, do you see that part about
13  "absorbent pads" and "signs"?
14      A   Yes.
15      Q   Does a jury need you to tell them that there
16  should be absorbent pads to cover up or mop up a leak?
17      A   Well, absorbent pads are not used to cover
18  up or mop up.  They're used as a means of containment.
19  And yes, I think the average juror would probably
20  misunderstand that as, no offense, you've kind of
21  misunderstood it.
22          And so yes, it does require somebody that
23  has experience and knowledge and training in this area
24  to identify and, I guess, to describe the standard of
25  care as it relates to what -- what does a

Page 45

12 (Pages 42 - 45)

**Page 50**

1   and absorbing hydraulic fluid.
2          Those types of products would be required in
3   this case, versus, say, a rag that was used, you know,
4   hanging out of a janitor's pocket.  That's really not
5   an appropriate way to remove hydraulic fluid from a
6   floor.
7          MR. SCHULZ:  Objection.  Nonresponsive.
8   BY MR. SCHULZ:
9      Q   Sir, you didn't test the rags or bucket in
10  this case, so you can't say they're insufficient; can
11  you?
12     A   I don't know what rags Ball uses.  And
13  you're -- are you stating that they're -- that they
14  did use rags to remove this hydraulic fluid?  Is that
15  what you're stating?  'Cause I was unaware of how they
16  removed the hydraulic fluid.
17     Q   Okay.  So you're not aware of how they
18  removed hydraulic fluid, so you're not able to say,
19  one way or the other, whether their method was
20  sufficient?
21     A   I don't know if they removed the hydraulic
22  fluid, how they removed the hydraulic fluid, what
23  containment methods they used to contain the hydraulic
24  fluid, and what materials they used to absorb the
25  hydraulic fluid.  And then, lastly, I -- I don't know

**Page 51**

1   how they disposed of the hydraulic fluid that was
2   removed from the floor.
3      Q   Do you know for sure that there was
4   hydraulic fluid on the part of the floor where
5   Mr. Taylor allegedly slipped?
6      A   That's my understanding, yes.
7      Q   Well, what is your understanding based on?
8      A   His testimony.
9      Q   Aside from Mr. Taylor's testimony, do you
10  have anything else to -- well, first of all, where did
11  Mr. Taylor say he slipped on oil?
12     A   By the baler, the equipment that he was
13  working next to.
14     Q   Mr. Taylor, you're saying, specifically
15  testified that he slipped on oil?
16     A   Well, he said there was oil.  I don't know
17  if he described it as hydraulic fluid, but he -- I
18  don't know the exact phrase, but he said that the --
19  the machine was discharging -- spraying out oil on the
20  floor at a pretty steady rate.  Quite a bit of liquid
21  was discharged on the floor and was in the -- some
22  form of repair.
23         They were going to be repairing the
24  broke --- I think it was a broken hose -- hydraulic
25  hose that broke, and it was spraying out hydraulic

**Page 52**

1   fluid on the floor.  That's my understanding.
2      Q   Okay.  Do you have any way to independently
3   verify Mr. Taylor's statement regarding what he
4   slipped on?
5      A   Independently verify.  I don't know what you
6   mean by that.
7      Q   Well, one guy told me he slipped on soap.
8   Did you do anything else to check that statement?
9      A   I -- I don't know what other people's
10  opinions are or -- was that a deposition, you're
11  saying?
12     Q   Well, no.  Sir, my question is, besides
13  reading Mr. Taylor's deposition testimony, did you do
14  anything to check and see whether the thing that he
15  allegedly slipped on --
16     A   Well, there were photographs of the
17  hydraulic hose leaking.
18     Q   Okay.  Did he slip in the area of the
19  photograph?
20     A   Yes, that's my understanding.  It was the
21  same general area.
22     Q   Well, the same general area or the place
23  where he slipped?
24     A   Well, I don't know how to answer that
25  question.  It's -- to me, it's all the same.  The

**Page 53**

1   location where the hydraulic fluid was being sprayed
2   out was the same location where Mr. Taylor had slipped
3   and fallen.
4      Q   Did Mr. Taylor slip on soapy water?
5      A   No.  My understanding is it was hydraulic
6   fluid.  Now, there may have been some mopping that was
7   done that may have just spread the hydraulic fluid via
8   the mop, or -- which oftentimes very common is workers
9   walking through the hydraulic fluid will track it to a
10  larger area.  But at the end of the day, the hazardous
11  material, the -- the substance that Mr. Taylor slipped
12  and fell on, was hydraulic fluid.
13     Q   Can you guarantee that Mr. Taylor would not
14  have slipped if Ball had taken the corrective actions
15  that you suggest in your report?
16     A   Well, I don't suggest in my report that
17  there was any guarantee.  It's actually a matter of,
18  was it more reasonable or not?  And the answer is yes.
19  If the floor was properly maintained, clean and clear
20  of the hazardous substance, in this case, hydraulic
21  fluid, then it would be less likely -- the risk of
22  slipping and falling for workers would be reduced.
23         But given that the fact you had a lubricant
24  on the floor being discharged, that was on the floor
25  for at least a day, maybe two days, that was directly

**Page 62**

1 Q What is the basis for your opinion?
2 A Well, the defendant knew that there was a
3 hazardous condition present in the location where
4 Mr. Taylor was working, both on the day of his fall
5 and the previous day. The defendant made no effort to
6 cordon that area off, to barricade the area, as to
7 prohibit Mr. Taylor from entering it.
8     They made no effort to properly contain the
9 hazardous condition, in this case, hydraulic fluid,
10 from spreading onto the floor, meaning people
11 could -- other workers could be walking through it,
12 trafficking -- or tracking that contaminant in an area
13 beyond just where it's being created.
14     And so the defendant also, presumably, had
15 the ability to contain, restrict, warn, and barricade
16 the area, number one, and then, secondly, had a
17 responsibility to inform Mr. Taylor, who was not their
18 employee -- he was a contracted worker -- to simply
19 not go into the area until it gets cleaned up and it's
20 safe to go into.
21 Q Did you see evidence that Ball was
22 undertaking efforts to fix the leak from occurring?
23 A No. They said they were going to fix it,
24 but, for whatever reason, it didn't get repaired. It
25 continued to leak the second day.

**Page 63**

1 Q So my question was a little different. Did
2 you see any evidence of efforts to fix it at all?
3 A What do you mean by "effort to fix"?
4 Q I guess, my question is this: does fixing a
5 thing that is causing a leak constitute a proper
6 effort to stop the leak? I'm just talking about
7 conceptually now in general.
8 A Well, it depends. Obviously, they wanted to
9 fix the broken hose or the leaking hose to get the
10 equipment up and running, so that's the purpose of
11 fixing it. The secondary response to fixing it is
12 that it would no longer be spilling hydraulic fluid on
13 the floor.
14     And so fixing it not only gets the equipment
15 up and running again, which is the business they're
16 in, and it also stops the spread of hydraulic fluid on
17 the floor, which is a safety benefit.
18 Q And you're saying that Ball made no effort
19 to fix the machine so that it wouldn't leak?
20 A No, they made an effort on the first part,
21 to attempt to repair the hose to get the equipment up
22 and running. But they did not make an effort to
23 contain the spill, remove the spill -- when I say "the
24 spill," again, hydraulic fluid -- warn of the spill,
25 and, most importantly, restrict access to the area

**Page 64**

1 where the spill was -- was at, the hydraulic fluid was
2 being spilled onto the floor. That's what they did
3 not make a effort on.
4 Q What areas of the floor was the hydraulic
5 area -- hydraulic fluid being spilled?
6 A What area of the floor was the hydraulic
7 fluid on?
8 Q Yes.
9 A Yeah, it was right by the baler, the -- the
10 equipment that you see on the surveillance video where
11 Mr. Taylor was kind of behind. The camera, of course,
12 doesn't capture him falling, but you see the location
13 of the work area that Mr. Taylor was working in. And
14 it was presumably that device that you see on the
15 surveillance video, the equipment.
16 Q So what's your basis for saying that the
17 hydraulic fluid was there?
18 A What basis is there for saying hydraulic
19 fluid was there? Well, that's -- that's what this
20 case is about; right? I mean, is -- is anybody
21 contending that there was not hydraulic fluid on
22 the -- on the ground? I didn't hear that.
23 Q Well, sir, my question to you was, as to the
24 presence or absence of hydraulic fluid in the area
25 where Mr. Taylor allegedly slipped, what is your basis

**Page 65**

1 for saying that there was such hydraulic fluid?
2 A Well, that's what the photographs show.
3 That's what Mr. Taylor stated. He did, in fact, slip
4 and fall. And the evidence all points to leaking
5 hydraulic fluid onto the floor as the basis by which
6 the unreasonably dangerous condition was created.
7 Q What's your basis for saying, "He did, in
8 fact, slip and fall"?
9 A Well, it -- why are we here? He -- the man
10 fell; right? He slipped and fell and injured himself.
11 In fact, you see him walking around behind the
12 equipment, kind of limping.
13     There is another worker -- I don't know who
14 the gentleman was -- that you see walk around the
15 equipment and, presumably, help Mr. -- Mr. Taylor up
16 off the ground. I don't know who the gentleman is
17 seen on the surveillance video, but I guess I would
18 call him a potential witness. He was actually there.
19 He saw the -- Mr. Taylor's -- you know, on the ground,
20 so.
21 Q So I'm just curious. You're stating it as a
22 fact that Mr. Taylor slipped and fall -- fell. I just
23 want to know your basis for that.
24 A Well, that's my understanding. That's
25 the -- the facts and evidence. What I've been

**Page 70**

1  to arrive at a conclusion regarding a dangerous
2  condition at Ball's facility; is that correct?
3     A   That's what the -- the document states.
4  Yes.
5     Q   Well, no, sir.  My question is, in the
6  Taylor case, did you also not use a testing method,
7  testing battery, or national standard to arrive at
8  your conclusion about the dangerous condition of the
9  surface?
10    A   Well, those are two different questions.  I
11 did not perform any testing.  As I mentioned earlier,
12 there's no way to test that particular surface with
13 any credibility.  And so testing a surface via an --
14 an orthodox or undefined principle, in -- in my
15 industry, as a scientist would be simply to confuse or
16 mislead the jury.  And so no, in the absence of a
17 recognized test method, testing was not done.
18    Q   So we've seen three opinions from the
19 Jenkins case that are very similar to your opinions in
20 this case.  Do your reports follow a form?
21    A   Does my what follow a form?
22    Q   Do your reports that you publish follow a
23 form?
24    A   Generally speaking, yes.
25    Q   How often do you conclude the points 1, 2,

**Page 71**

1  and 3, or something very similar to it, in your
2  reports that you publish?
3     A   Well, it depends on the matter.  In -- when
4  I'm representing an opinion on a specific type of
5  incident, whether it's a trip and fall, that would be
6  a different form.  When I say "form," it -- outline.
7  Maybe that's a better word.  That would be specific to
8  that particular case.
9         If I'm working on a matter of a -- of a slip
10 and fall in a bathtub, that would follow a different
11 format or outline.  The same is true in this case.
12 And so my reports are structured, as you can see,
13 Mr. Schulz, to be very much to the point.  I don't
14 want to waste a lot of time.  I'm not going to write a
15 28-page report, of which 26 pages is meaningless
16 bologna to confuse everybody.
17        I'm going to write a report as my format,
18 guideline, to kind of get to the -- get to the point.
19 What happened?  What are the standards that are
20 applicable?  Was there a breach of those standards,
21 meaning the standard of care?  And if so, why?  That's
22 my -- that's my form or guide -- guideline that I'm
23 referring to.
24    Q   So let's eliminate bathtub cases and let's
25 eliminate trip and falls.  And let's focus on

**Page 72**

1  plaintiffs' cases involving slips on surfaces.  How
2  often do you reach these same conclusions in reports
3  that you're writing?
4     A   Well, it depends.  My conclusions are not
5  the same in every case.  There may be elements of my
6  report that are duplicative, as you're pointing out in
7  this Jenkins matter.  But keep in mind, Mr. Schulz, I
8  work on over a thousand cases.  Many of them are very
9  similar in nature, so it's the same pattern.  Not the
10 same result, not the same facts, but the same trend,
11 the same issue.  Maybe that's a better word to use.
12        And so a workplace slip and fall would be
13 kind of like this case.  What are the rules that
14 govern a workplace slip and fall?  Well, I detail
15 those in my report, and that's specific to this type
16 of a case.
17        But a slip and fall in a bathtub, well,
18 that's -- there's no OSHA requirements for that
19 or -- it's a different set of standards and -- and of
20 course, draws different conclusions and opinions.
21    Q   How often have you opined that a walking
22 surface "constituted a dangerous condition and posed
23 an unreasonable risk of harm"?
24    A   When it does.
25    Q   Out of your thousand cases, what number?

**Page 73**

1     A   Oh, I don't know.  I -- I work on such
2  a -- such a diverse group.  Let me back up.  It might
3  be helpful.  I get calls every day from lawyers.  A
4  lot of cases I get presented, I say, can't help you,
5  or I don't believe you -- your client.  Or, sorry, you
6  got the wrong guy.  And so of the 1300 cases that I've
7  been retained in, there's probably another 700 that I
8  just turn down.  I -- I'm not going to get involved.
9         The case has to have merit, credibility,
10 facts.  It has to make sense.  And if it doesn't make
11 sense, I'm not -- I'm not interested because I really
12 don't get involved in everybody's slip-and-fall case.
13 So I do screening of every case and want to make sure
14 I know it's -- what's at hand, what's -- what's going
15 on.  And this case is no -- no different.
16        MR. SCHULZ:  Objection to the
17 nonresponsive portion of the answer.
18        Lonn, let's go back, please, to the
19 witness's report.  Thank you.  We're on page 4.
20 BY MR. SCHULZ:
21    Q   All right.  Number 4 on your screen, sir, is
22 that your opinion regarding "prior to Mr. Taylor's
23 fall"?
24    A   Yes.
25    Q   What's the basis for that opinion?

1 is no expert rhyme or reason to the underlying
2 opinion. As a result, Kendzior's input on causation
3 would not help the jury." Do you remember that?
4   A   No.
5   Q   What was the Brower case about?
6   A   I don't remember. Obviously, a slip and
7 fall. I don't remember the -- the details of that
8 case.
9   Q   Do you recall that there was a video in the
10 Jenkins case?
11   A   Nope. Honestly, sir, I work on cases every
12 day, and to ask me about a case three years ago is
13 like asking me what I ate for dinner three years ago.
14 I -- unless -- unless I have that in front of me,
15 I -- I don't have that file, so I'm not here to speak
16 about a case I worked on two years ago or -- or from
17 memory.
18   Q   Well, sir, this Brower case was pretty
19 important in the Southern District of Texas, so that's
20 why I'm asking about it.
21   A   Yeah. Well, hey, judges have opinions too,
22 right? I'm not -- not questioning that.
23   Q   Where in your report, sir, do you evaluate
24 anything that Mr. Taylor did or didn't do that may
25 have caused or contributed to his alleged fall?

Page 78

1   Q   So you didn't specifically address
2 Mr. Taylor's acts or omissions in your report?
3   A   Again, it's just based on the facts that
4 I've been presented, the evidence I've reviewed. I'm
5 not here to speculate about what Mr. Taylor could have
6 done. Okay. I don't -- I don't do that, generally.
7   Q   Did you rule out Mr. Taylor's acts or
8 omissions as a cause of the loss?
9   A   I don't -- I didn't rule it in or rule it
10 out. I just don't have any information that would
11 suggest he did anything unreasonable, that he did
12 something to cause his fall that was otherwise
13 preventable. I -- I don't -- I don't have any
14 information along those lines.
15   Q   Should you always evaluate whether a person
16 contributed to his or her own slip and fall?
17   A   It depends on the facts of the case. For
18 example, if this area was barricaded -- and you -- you
19 asked this question a moment ago. If the area was
20 barricaded and Mr. Taylor breached the barricades, he
21 walked around them, yeah -- yeah, then he would have
22 some responsibility for that injury. But there's no
23 evidence to suggest anything like that that occurred
24 in this case.
25   Q   Would you agree with me that someone working

Page 80

1   A   I have no knowledge or evidence that he did
2 anything that contributed to his fall. He was just
3 working. As you see in the surveillance video, wasn't
4 running, didn't appear to be preoccupied. He was just
5 doing his job.
6   Q   My question was a little different, sir.
7 Did you expressly evaluate anything in your report or
8 analysis in your report regarding anything that
9 Mr. Taylor may have done to contribute to the
10 incident?
11   A   Well, again, it's -- there's no evidence
12 that suggests he was doing anything unreasonable, so
13 why would I cite that?
14   Q   Well, did you eliminate it as a potential
15 cause of the incident?
16   A   Eliminate what?
17   Q   Mr. Taylor's acts or inaction.
18   A   As I just said, what? What acts? What acts
19 did he -- I mean, tell me what you mean by that.
20   Q   Well, I'm just asking, sir, is there
21 anything in your report where you note -- that you say
22 something like, nothing Mr. Taylor did was wrong?
23 Nothing he did contributed?
24   A   No, I don't recall putting -- that's not in
25 my report.

Page 79

1 in a manufacturing setting should have his eyes on the
2 path?
3   A   Rely upon what?
4   Q   Sorry. Let me say that again. Would you
5 agree with me that someone working in a manufacturing
6 setting should have his eyes on the path where he's
7 walking?
8   A   Well, certainly. Not just in a
9 manufacturing setting, but anywhere. As you're
10 walking out of your office to your car, for example.
11   Q   What's your evidence for saying Mr. Taylor
12 had his eyes on the path?
13   A   Well, what evidence is there to say he -- he
14 didn't? I -- my point is I don't have evidence to
15 suggest he did anything unreasonable. That's my
16 point.
17   Q   Would you agree with me that, when
18 Mr. Taylor entered Ball's facility, he had at least
19 some responsibility for his own safety?
20   A   Yes.
21   Q   What is that responsibility?
22   A   Well, he wants to ensure that he's doing his
23 job in a safe way; that he has proper equipment,
24 proper shoes, footwear, training, information, all the
25 things that go with him performing his function,

Page 81

21 (Pages 78 - 81)

**Page 86**

1  condition of his employment where they said, hey, if
2  you want to work for Ball, you got to sign off on
3  these policies and procedures. I'm not even certain
4  he read them. But that's for you to take up with him.
5    Q   If Mr. Taylor signed off on these policies
6  and procedures, is he bound by them?
7    A   I don't know. That's a legal question.
8    Q   Do you think it's appropriate for employers,
9  even temporary employers, to put policies and
10 procedures in place that include employee
11 responsibilities?
12   A   Well, he's not an employee of Ball; right?
13 So yeah, of course, you can't -- you can't hold
14 someone who is not an employee to employee policies
15 and responsibilities.
16   Q   My question, though, sir, was employers,
17 even temporary employers, so. Anyway, I can see where
18 you were going. But suffice it to say, you didn't
19 review Mr. Taylor's agreements with Ball, if any, so
20 you can't opine on them one way or another?
21   A   That's correct. And again, I'm not here to
22 argue his status of employment, but he was not an
23 employee. He was not a temporary employee. My
24 understanding is Mr. Taylor was a contracted employee.
25 He -- his employer was ManPower. That was his

**Page 87**

1  employer.
2      And he was given a -- a project at Ball's
3  facility. And so he should be given the same level of
4  concern as it relates to safety as any of the Ball
5  employees should be granted. That's my point.
6    Q   Under 3.2, it says "It is each employee's
7  duty to participate in the accident prevention program
8  by being alert for unsafe or potentially substandard
9  conditions or acts, and doing his or her part to
10 correct the situation by immediately reporting any
11 such conditions or acts to his or her supervisor."
12 Does Mr. Taylor have that responsibility to Ball?
13   A   No. But that's a good point because what
14 it -- what it says is what I've been saying. Ball's
15 employees, people who get a paycheck from Ball, that's
16 their responsibility, is to safeguard. Exactly. But
17 they didn't.
18   Q   So I just want to be clear. See something,
19 say something, does not apply to Jaasin Taylor?
20   A   Does it?
21   Q   That's my question to you, sir.
22   A   I'm asking. I don't know. Say -- say what
23 to who? He didn't -- he was not a -- he was there on
24 his second day. I -- I mean, it -- really? It's like
25 saying, hey, you signed a policy that says if anybody

**Page 88**

1  steals a car out of our parking -- parking lot,
2  Mr. Taylor, you're responsible. Well, he signed the
3  bottom of the form, so I guess he's responsible.
4      If you read these -- these policies and
5  procedures -- look at number 6. Look at number -- go
6  through every one of them. It's clearly written for
7  employees of Ball, not for contracted employees.
8  Every single sentence -- you know, "company-furnished
9  uniforms." Mr. -- Mr. Taylor wasn't given a
10 company-furnished uniform; right? I mean, just --
11   Q   Sir, as to Mr. Taylor, does he have a
12 responsibility to see something, say something, if he
13 sees a dangerous condition in his workplace?
14   A   I don't know. Say something and to who?
15 Maybe that's the question I need to ask. To ManPower?
16 Who -- who would he say something to?
17   Q   So you just don't know?
18   A   No, I'm asking the question. You're --
19 you're asking me a question about say -- see
20 something, say something. And my -- my question to
21 you is, what -- to whom are you suggesting he should
22 have said something to?
23   Q   Anyone to anything.
24   A   I'm not laughing at you. It's just, what
25 does that mean?

**Page 89**

1    Q   Well, sir, I -- you ride the --
2    A   What does that mean? Anything to anybody?
3    Q   You ride the subway in New York, the police
4  always say, "You see something, say something." It's
5  not tricky. If you see something that looks weird or
6  dangerous, tell someone who looks responsible. Are
7  you saying that that simple duty or that simple task
8  does not apply to Jaasin Taylor?
9    A   No, I'm not saying that. My -- my question,
10 which you may have answered, is, they knew -- Ball
11 knew that this was leaking. So what would he have
12 said to Ball that they already didn't know? Hey, you
13 have a leaking pipe -- hose that's discharging
14 hydraulic fluid all over the floor.
15     They would say, yeah, we know. It's --
16 we're going to have it fixed tonight. 'Cause that's
17 the facts. They already knew that this was being
18 discharged. So he did, based on your question, see
19 something and said something.
20   Q   Do you have any indication that Mr. Taylor
21 said, look, this is too dangerous. Even when I try
22 and mop it, or whatever measures were taken, it's not
23 enough. It's still too dangerous?
24   A   I don't know what he said.
25   Q   Do you have any -- that Mr. Taylor refused

23 (Pages 86 - 89)

Page 90

1  to work and just said, this is plain too dangerous.
2  I'm not doing this anymore?
3     A   Well, in hindsight, that's what he should
4  have said. But at the time, I don't know.
5         MR. SCHULZ: Let's take a very short
6  break, please.
7         THE VIDEOGRAPHER: 11:39 a m.  We are
8  off the record.
9         (Off the record.)
10        THE VIDEOGRAPHER: 11:45 a m.  We are
11 on the record.
12 BY MR. SCHULZ:
13    Q   Sir, are you ready to continue?
14    A   Yes.
15    Q   Thank you.
16        MR. SCHULZ: Lonn, could you please
17 bring up the security video? We'll mark it as the
18 next exhibit.
19        (Kendzior Exhibit 6 was marked for
20        identification.)
21 BY MR. SCHULZ:
22    Q   All right. Sir, do you recognize this
23 video, at least as it's starting? We haven't -- or
24 we're starting it now, I guess.
25        (Video played.)

Page 91

1         Do you recognize this?
2     A   Yes.
3     Q   Is this the security video of the incident
4  area that you reviewed recently?
5     A   Yeah. Unfortunately, you can't see the
6  slip-and-fall incident because it's behind the
7  equipment you see in the background, behind the pallet
8  jack and the boxes that are stacked up. But yes.
9     Q   Okay. As an initial matter, looking at this
10 video, are you able to tell where there is hydraulic
11 fluid on the floor?
12    A   No.
13    Q   At any point during the course of the video,
14 are you able to see hydraulic fluid on the floor?
15    A   No. Unless the -- I -- I say, "No."
16 There -- it's -- I can't say with certainty. But if
17 you look behind the -- where the forklift is -- and
18 there's a pallet in front of the forklift -- there
19 appears to be some type of a liquid on the floor --
20    Q   I'm going to move my cursor. Are you
21 referring to this white area?
22    A   No. I'm saying, if you go up to where the
23 pallet jack is -- or I'm sorry. The -- the pallet --
24 yeah, forklift. Yeah, right there. If you look to
25 the right of where your cursor is, there appears to be

Page 92

1  some type of a liquid -- yes, there you go -- on the
2  floor. I don't know what that is, if that's hydraulic
3  fluid or some other substance.
4     Q   Okay. How do we know that's liquid?
5     A   Well, it appears to be. It's a different
6  color, different material than the concrete.
7     Q   Okay. But are we positive it's liquid, or
8  we think it's liquid?
9     A   Well, it appears to be some substance on the
10 floor.
11    Q   Is the substance a different color from the
12 floor?
13    A   I don't know. It -- based on this camera
14 angle, you -- the -- the higher gloss. That's why I
15 thought it was a -- think it's a liquid. It kind of
16 reflects back to the camera as a different color. But
17 when you're standing over it, it might not be -- well,
18 if it's hydraulic fluid, it's going to be clear.
19    Q   Is it fair to say, at least at this vantage
20 point, the floor looks gray and the suspected
21 substance looks white?
22    A   Yeah, it looks reflective. Right.
23        MR. SCHULZ: All right. Let's go ahead
24 and hit play, please, Lonn.
25        (Video played.)

Page 93

1         THE WITNESS: Mr. Schulz, I just want
2  to remind you, in ten minutes, I'm going to have to
3  leave. Just to give you heads up.
4         MR. SCHULZ: Understood.
5  BY MR. SCHULZ:
6     Q   It looks like the video is buffering. All
7  right. Okay. We're at time code 11:48:29. What do
8  you see Mr. Taylor doing here?
9     A   Mopping the floor.
10    Q   And is Mr. Taylor using proper mopping
11 technique?
12    A   It appears to, yes.
13    Q   Where is he mopping, exactly?
14    A   Behind the -- well, I don't know what all
15 the equipment is, but there is material handling
16 equipment. There's the -- I guess that's the baling
17 machine.
18    Q   Do you have any opinions about how baling
19 machines should function or a possible malfunction?
20 Are you going to testify as to that?
21    A   No, sir.
22    Q   Mr. Taylor looks like he's walking around
23 now. Where should the barricades have been placed?
24    A   The entire area between the green poles that
25 have the yellow bumpers on them. I mean, the entire

24 (Pages 90 - 93)

```
 1        CERTIFICATE OF DEPOSITION OFFICER
 2        I, KELSEY PETERSON, the officer before whom
 3   the foregoing proceedings were taken, do hereby
 4   certify that any witness(es) in the foregoing
 5   proceedings, prior to testifying, were duly sworn;
 6   that the proceedings were recorded by me and
 7   thereafter reduced to typewriting by a qualified
 8   transcriptionist; that said digital audio recording of
 9   said proceedings are a true and accurate record to the
10   best of my knowledge, skills, and ability; that I am
11   neither counsel for, related to, nor employed by any
12   of the parties to the action in which this was taken;
13   and, further, that I am not a relative or employee of
14   any counsel or attorney employed by the parties
15   hereto, nor financially interested in the
16   outcome of this action.

17                    K. Peterson
                     KELSEY PETERSON
18                Notary Public in and for the
19                     State of Texas
20
21   [X] Review of the transcript was requested.
22
23
24
25
                                              Page 102
```

```
 1         CERTIFICATE OF TRANSCRIBER
 2        I, BETHANY HOWARD, do hereby certify that
 3   this transcript was prepared from the digital audio
 4   recording of the foregoing proceeding, that said
 5   transcript is a true and accurate record of the
 6   proceedings to the best of my knowledge, skills, and
 7   ability; that I am neither counsel for, related to,
 8   nor employed by any of the parties to the action in
 9   which this was taken; and, further, that I am not a
10   relative or employee of any counsel or attorney
11   employed by the parties hereto, nor financially or
12   otherwise interested in the outcome of this action.
13
14
             Bethany Howard
15            BETHANY HOWARD
16
17
18
19
20
21
22
23
24
25
                                              Page 103
```

```
 1   Taylor, Jaasin v. Ball Corporation
 2   Russell J. Kendzior Job No. 5679456
 3           E R R A T A  S H E E T
 4   PAGE_____ LINE_____ CHANGE_____
 5   _____
 6   REASON_____
 7   PAGE_____ LINE_____ CHANGE_____
 8   _____
 9   REASON_____
10   PAGE_____ LINE_____ CHANGE_____
11   _____
12   REASON_____
13   PAGE_____ LINE_____ CHANGE_____
14   _____
15   REASON_____
16   PAGE_____ LINE_____ CHANGE_____
17   _____
18   REASON_____
19   PAGE_____ LINE_____ CHANGE_____
20   _____
21   REASON_____
22
23   _____  _____
24   Russell J. Kendzior              Date
25
                                              Page 104
```

```
 1   Taylor, Jaasin v. Ball Corporation
 2   Russell J. Kendzior 5679456
 3          ACKNOWLEDGEMENT OF DEPONENT
 4       I, Russell J. Kendzior, do hereby declare that I
 5   have read the foregoing transcript, I have made any
 6   corrections, additions, or changes I deemed necessary as
 7   noted above to be appended hereto, and that the same is
 8   a true, correct and complete transcript of the testimony
 9   given by me.
10
11   _____  _____
12   Russell J. Kendzior              Date
13   *If notary is required
14       SUBSCRIBED AND SWORN TO BEFORE ME THIS
15       _____ DAY OF _____, 20___.
16
17
18       _____
19           NOTARY PUBLIC
20
21
22
23
24
25
                                              Page 105
```